IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOBBY RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20 C 4254 |
| | ) | |
| VILLAGE OF DOLTON, OFFICER | ) | Judge Virginia M. Kendall |
| PATRICK CARR #104, OFFICER | ) | |
| CAMERON BIDDINGS #134, and | ) | |
| OFFICER ENRIQUE HERRERA, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION & ORDER

Plaintiff Bobby Richardson sued Defendant Officers Patrick Carr, Cameron Biddings, and Enrique Herrera under 42 U.S.C. § 1983 for violating his constitutional rights when they arrested him at a White Castle. (Dkt. 21). He also made several state-law claims against the defendant officers and the Village of Dolton as their employer. (*Id.*) Defendants moved for summary judgment on all claims. (Dkt. 46). For the following reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

BACKGROUND

**A. Initial Interaction**

The parties' accounts of the events conflict, though surveillance footage helps somewhat to clarify how events unfolded. Plaintiff Bobby Richardson and his friend, Calvin Lloyd (not a party), stopped to get food at a White Castle, where Defendant Officer Patrick Carr was taking an unofficial break. (Dkt. 51 ¶¶ 1–4). From several feet away, Officer Carr watched Richardson and Lloyd wait to order their food at the counter. (Dkt. 50, Video 1 at 4:29:24–4:30:00). Carr perceived

1

them both as being "loud and unruly and making vocal comments to the young lady that was standing there, who had just ordered, and towards the staff." (Dkt. 47-3 at 34:16–18). Richardson, however, says that everything was friendly, and he denies speaking with any of the customers or making any unruly or derogatory comments. (Dkt. 47-2 at 24:5–16; Dkt. 51 ¶ 5).

As Richardson stood at the counter, Lloyd walked over to Carr, bumping Carr's left shoulder with his right shoulder. (Dkt. 47-3 at 37:6–7; Video 1 at 4:30:00–19). Carr told Lloyd not to do that again, and directed Lloyd to "stay back over there," while pushing Lloyd away. (Dkt. 51 ¶ 9; Video 3 at 4:30:19–23). Lloyd returned to the counter, closer to Richardson, and talked to an employee behind plexiglass and Richardson while Carr continued watching. (Video 3 at 4:30:41–4:32:39). Richardson did not engage with Carr. (Dkt. 47-3 at 87:3–11).

After a couple minutes, Lloyd walked back toward Carr, passed him, and stood further away from Carr than he had stood during their earlier interaction. (Video 3 at 4:32:39–49). Richardson also turned around, walked toward Carr, stopped in front of him, dropped his money and bent down to pick it up. (Video 3 at 4:32:49–4:33:03; *see also* Video 1 at 4:32:49–4:33:03; Dkt. 47-3 at 87:14–19). At that point, Carr said he was not sure if Richardson said anything. (Dkt. 47-3 at 87:20–22). Richardson stood up in front of Carr. (Video 3 at 4:33:03). The accounts differ about what happened next.

For his part, Carr claims that when Richardson stood in front of him, Richardson was saying, "y'all a bunch of killers." (Dkt. 47-3 at 88:15–89:10). Richardson then raised his arms and said, "I'll f--- you up and kick your ass." (Dkt. 47-3 at 89:11–91:10). Carr radioed for another unit "for unruly subjects in the White Castle." (Dkt. 57 ¶ 10; Dkt. 51 ¶ 16; Dkt. 56, Radio Call). Throughout their interaction, he claims Richardson was "still talking he will f--- me up and we're a bunch of killers," "moving his hands about," and that both Richardson and Lloyd were "both

2

pretty much saying the same thing." (Dkt. 47-3 at 91:10–20; Dkt. 47-3 at 92:7–93:13). The interaction ended when Richardson walked back over to the counter. (Video 3 at 4:35:22).

Richardson, on the other hand, contends that after ordering his food when he turned around from the counter, Lloyd was talking to Carr, so Richardson walked over to stand near his friend. (Dkt. 47-2 at 25:19–21). Richardson had not heard what Carr and Lloyd were saying to each other before walking over, but he did not perceive any hostility. (Dkt. 47-2 at 26:5–16). Carr told him, "Get away from me. Get the F away from me. Get away from me," which left him stunned and confused. (Dkt. 47-2 at 26:21–27:18). Richardson denied ever using the "f---" word to Carr, (dkt. 47-2 at 28:19–23), or initiating any hostile action. (Dkt. 47-2 at 29:9–10). While Richardson admitted saying something like "Ya'll are a bunch of motherf-----s" during the officers' later attempt to arrest him, (dkt. 47-2 at 29:15–24), he denied saying anything hostile during his interaction with Carr. (Dkt. 47-2 at 30:1–11). Referencing the police report Carr later wrote about the incident, Richardson could not remember if he said, "You all are a bunch of killers." (Dkt. 47-2 at 31:14–20). But Richardson denied saying to Carr, "I'll kick your motherf-----g ass." (Dkt. 47-2 at 31:21–32:3; Dkt. 53-3 at 3).

While the security footage does not capture what Richardson and Carr were saying to each other during their roughly two-and-a-half-minute interaction, it shows Richardson raised his hands to waist height in a palms-up position. (*See* Video 3 at 4:33:00–4:35:22; Dkt. 57 ¶ 9). Carr thought any arm movement would have been a threat after Richardson's statements. (Dkt. 47-3 at 90:18–24, 108:7–10). Throughout that time, Lloyd was walking around, making comments, and gesticulating, while Richardson stood in front of Carr. (*See* Video 3 at 4:33:00–4:35:22). Carr was leaning against a counter with his legs crossed, his right arm resting on the counter, and his left thumb hooked into his pocket. (Dkt. 57 ¶ 11).

3

**B. Richardson's Arrest**

Soon after Richardson ended the interaction with Carr and joined Lloyd at the food counter, Defendant Officer Enrique Herrera arrived at White Castle. (Dkt. 51 ¶ 18; Video 3 at 4:35:43). Richardson at that point was facing the counter, with his back to Carr. (Dkt. 51 ¶ 20). The parties again largely dispute how to characterize what happened after that.

Once Herrera arrived, Carr said he moved towards Richardson to tell him he was under arrest and attempted to place him in custody in a "simultaneous motion." (Dkt. 51 ¶ 19; Dkt. 47-3 at 98:2–4). Richardson claims Carr grabbed him before informing Richardson he was under arrest, (dkt. 57 ¶ 13); he had no time to perceive Carr coming up behind him before feeling that his left arm was grabbed, (dkt. 47-2 at 34:1–24); he did not know an officer was arresting him; and he thought he was being attacked and did not know by whom. (Dkt. 47-2 at 34:1–24). The surveillance footage audio does not resolve when officers told Richardson he was under arrest. (*See* Video 3 at 4:35:43–49).

As Carr handcuffed Richardson's left wrist, Richardson tried to get away, and Carr pulled him back. (Dkt. 51 ¶ 21). Carr then tried to put Richardson's right hand behind his back. (Dkt. 51 ¶ 23). Carr claims he told Richardson to put his hands behind his back, that he was under arrest, and to stop resisting. (Dkt. 51 ¶ 24). Herrera hurried to assist Carr, and a scuffle broke out between Richardson, Carr, and Herrera. (*Id.*; *see also* Dkt. 51 ¶¶ 26–27). Richardson pushed his body against Carr and twisted his arms and body away from him. (Dkt. 51 ¶ 28). The three men fell to the ground, with Herrera and Carr on top of Richardson. (Dkt. 51 ¶ 30; Video 3 at 4:35:57–58). After they stood back up, Richardson continued struggling. (*Id.* at 4:36:06–35).

During the struggle, the officers say Richardson was pushed forward, and his head hit the plexiglass divider on the counter a couple of times. (Dkt. 51 ¶ 29; Dkt. 57 ¶ 15; Dkt. 47-3 at 99:22–

100:16). Richardson says the officers picked him up and slammed his head into the plexiglass. (Dkt. 57 ¶ 18; Video 3 at 4:36:07–12). Herrera put Richardson in a head lock or hold from behind. (Video 3 at 4:36:20–37; Dkt. 47-3 at 101:6–11).

At about this time, Defendant Officer Cameron Biddings arrived and began to assist Herrera and Carr to arrest Richardson, who continued struggling. (Video 3 at 4:36:35–48; Dkt. 51 ¶¶ 32–33). Biddings had unholstered his taser when he entered the White Castle to arch it (i.e., use the device's noise to deter an arrestee's resistance), but he did not shock Richardson. (Dkt. 51 ¶¶ 35–36). Carr and Biddings then pulled Richardson's legs out from under him, subdued him to the restaurant floor, and handcuffed his right hand. (Dkt. 51 ¶ 36). Richardson does not dispute Biddings swept his feet out from under him, but adds that at that moment, Carr was holding him, and Herrera was choking him. (Dkt. 57 ¶ 21; Video 3 at 4:36:46–50). Carr kneeled on Richardson to hold him down. (Dkt. 47-3 at 102:4–9). Biddings placed his knee on the upper part of Richardson's back and put him in handcuffs. (Dkt. 47-4 at 29:19–9).

Richardson maintains he kept trying to escape throughout the whole ordeal because he did not know what was going on but thought his attackers were going to hurt him. (Dkt. 51 ¶¶ 38, 41; Dkt. 57 ¶ 22). After being fully handcuffed on the floor, Richardson rolled over and attempted to stand again, and Carr held Richardson's shoulders to keep him down. (Dkt. 51 ¶¶ 39–40). He gave up struggling after the officers also arrested Lloyd. (Dkt. 47-2 at 41:19–42:1). An officer put Richardson in a squad car to be taken to the police station. (Dkt. 47-2 at 44:7–8).

Richardson testified that on the way to the station, when only he and Officer Herrera were in the car, Herrera stopped the car at some point, pulled over, and "smacked" him a couple of times. (Dkt. 47-2 at 44:12–47:2). Herrera was not deposed, and neither Carr nor Biddings knew if Herrera had stopped the car while transporting Richardson to the station. (Dkt. 57 ¶¶ 24–25).

Biddings admitted an audio clip of his voice on the radio dispatch tells Enrique [Herrera] to stop, (dkt. 47-4 at 34:2–36:4; dkt. 56, Audio Clip 1), but he did not know the context of that clip, where it happened, or why he was telling Enrique to stop. (Dkt. 47-4 at 35:15–36:4).

Richardson testified that after he got to the police station, he requested medical attention. (Dkt. 57 ¶ 28). But according to him, when an Officer Staples (not a party) saw he was accused of fighting with a cop, she refused his request. (Dkt. 57 ¶ 28; Dkt. 47-2 at 49:18–50:9). He spent the night in jail, (dkt. 47-2 at 47:20–48:15), and in the morning, he was arraigned and then his sister posted his bail. (Dkt. 47-2 at 53:3–21).

### C. Richardson's Charges, the Aftermath, and Procedural History

Carr signed three criminal complaints against Richardson for misdemeanor battery, resisting a peace officer, and assault. (Dkt. 51 ¶¶ 45–46). Richardson appeared in court several times while the criminal charges were pending. (Dkt. 61 ¶ 12–21). Carr did not attend any court dates, and the prosecutor eventually dismissed the charges *nolle prosequi* in July 2020, a year-and-a-half later. (Dkt. 51 ¶ 47). While the charges against Richardson were pending, no officer ever completed a use-of-force report, took a witness statement, or retrieved the surveillance footage from White Castle. (Dkt. 57 ¶ 34).

Richardson missed an interview with Menards the day after his arrest, and that he lost out on job opportunities with Uber, Amazon, and Titan Security because of the arrest and pending charges on his record. (Dkt. 57 ¶ 31). Uber relied on the pending charges in deciding not to hire him. (Dkt. 53-6). Richardson also said that immediately after the arrest, he had pain in his head, arms, right leg, and wrists. (Dkt. 57 ¶ 30). He claims he still suffers from pain in his shoulder. (Dkt. 57 ¶ 30). He further claims he does not like people standing behind him, that he has intrusive

thoughts of being attacked, and that he freezes at work when dealing with customers. (Dkt. 57 ¶ 32). He had one session with a therapist. (Dkt. 57 ¶ 33).

Richardson sued Officers Carr, Herrera, and Biddings, and the Village of Dolton. (Dkt. 1, Dkt. 21). He brings claims for damages under 42 U.S.C. § 1983 against the officers for violating his Fourth Amendment rights by subjecting him to excessive force, false arrest, unlawful pretrial detention, and conspiracy to deprive him of his constitutional rights. (Dkt. 21). He also brings state-law claims of battery, intentional infliction of emotional distress, and malicious prosecution against the officers and the Village of Dolton on a respondeat superior theory of liability. (*Id.*) He further alleges the Village of Dolton is liable under 745 ILCS 10/9-102 for indemnification of officers for any judgment he obtains against them. (*Id.*) Defendant Officers and the Village of Dolton move for summary judgment on all claims. (Dkt. 46).

LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Reed v. Columbia St. Mary's Hosp*., 915 F.3d 473, 485 (7th Cir. 2019). The Court takes the facts in the light most favorable to the non-moving party. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). When a non-moving party specifically avers material facts that contradict those of the moving party, the Court must deny summary judgment. *Id.* at 996 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). The Court does not "resolve swearing contests or decide which party's facts are more likely true" at the summary judgment stage. *Id.* (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). The fact finder must resolve credibility disputes. *Id.* (citing *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)).

<u>DISCUSSION</u>

**A. Constitutional Claims**

Richardson alleges that the defendant officers violated his constitutional rights and are liable for damages under 42 U.S.C. § 1983. The officers raise qualified immunity as a defense. Qualified immunity shields state officials from Section 1983 liability "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Gupta*, 19 F.4th at 1000 (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Courts may determine whether a constitutional right was clearly established before determining whether a violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For official action to violate a clearly established constitutional right, the law at the time must be "sufficiently clear" that "every reasonable official would understand that what he is doing is unlawful." *Gupta*, 19 F.4th at 1000 (cleaned up). A "clearly established" right does not require a case precisely on point, but existing precedent must place the constitutional question beyond debate. *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021). Qualified immunity thus provides officers "breathing room to make reasonable but mistaken judgments about open legal questions." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

**1. False Arrest**

A false-arrest claim requires Richardson to show that defendants arrested him without probable cause. *Abbott*, 705 F.3d at 713–14. "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714. The probable-cause determination is a "purely objective

8

inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id.* The court focuses on the officer's knowledge at the time of the arrest and whether those facts and circumstances amount to probable cause when viewed from an objectively reasonable officer's perspective. *Id.* When there is room for a difference of opinion concerning the underlying facts or the reasonable inferences to be drawn from them, summary judgment is inappropriate, and a jury must decide whether probable cause to arrest existed. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008); *see also Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) ("While the existence of probable cause is often a jury question, summary judgment is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.").

Probable cause depends on the elements of the underlying criminal offense, as defined by state law. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979); *Abbott*, 705 F.3d at 715. The crucial moment for the probable-cause determination is "the moment the decision is made" to arrest someone. *Qian*, 168 F.3d at 953. The facts and circumstances available to the arresting officer at that time must support probable cause to arrest. *Id.* This is "an *ex ante* test," and an officer's later discovery of additional support for probable cause that was "unknown at the time of the arrest is irrelevant to whether probable cause existed at the crucial time." *Qian*, 168 F.3d at 953–54 (citing *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994)).

Qualified immunity provides an "added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott*, 705 F.3d at 714 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)) (internal quotations omitted). "[A]rguable probable cause" protects officers who "reasonably but mistakenly believe that

probable cause exists." *Id.* at 714–15. An "arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right." *Id.* at 715.

Here, each officer encountered Richardson at a different time and under different circumstances. Therefore, whether each officer had arguable probable cause to arrest Richardson requires an individualized analysis.

### a. Officer Carr

Officer Carr claims he had at least arguable probable cause to arrest Richardson for assault, resisting arrest, and battery. (Dkt. 47 at 8–11). The Court begins with the first probable-cause determination Carr made: to arrest Richardson for assault.

In Illinois, a person "commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a); *Abbott*, 705 F.3d at 715. Assault, whether civil or criminal, requires "(1) a threatening gesture, or an otherwise innocent gesture made threatening by the accompanying words, that (2) creates a reasonable apprehension of an imminent battery." *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004). Words alone do not constitute assault; the accompanying gesture, in combination with those words, must give someone reason to believe he will be battered imminently. *People v. Floyd*, 663 N.E.2d 74, 76 (Ill. App. Ct. 1996). It is not enough that the alleged assault victim was afraid of being battered. *Floyd*, 66 N.E.2d at 76. The conduct is judged from the perspective of an objectively reasonable person in the victim's position. *Id.*

Here, there are disputed material facts as to whether Carr had an objectively reasonable apprehension of receiving an imminent battery from Richardson. The parties fundamentally disagree on what Richardson said in their two-and-a-half-minute interaction. Richardson denies he ever threatened Carr in the first place. (*See* Dkt. 47-2 at 30:1–11; Dkt. 47-2 at 31:21–32:3).

Accepting Richardson's account, a jury might reasonably conclude that Richardson never made the threatening statements Carr attributed to him, particularly as Lloyd can also be seen in the security footage walking around and making comments at the same time. (*See* Video 3 at 4:33:00–4:35:22). If a jury believes Richardson's testimony that he never said anything more threatening than "How you doing?" to Carr, it could reasonably conclude no assault occurred.

Furthermore, the parties genuinely dispute whether a reasonable person in Carr's position would have felt threatened by any statements Richardson might have made when Richardson raised his arms to waist height in a palms-up position without moving forward. Carr contends this gesture was "threatening" in combination with the statements, (dkt. 47-3 at 89:11–91:10), while Richardson argues it was "a universal gesture of passivity and confusion." (Dkt. 54 at 12). A jury could view the multiple angles of security footage of the full interaction and draw inferences either way.

If a jury concludes after resolving the underlying factual disputes that Richardson did not assault Carr—and infers either that it was objectively unreasonable for Carr to believe he did, or alternatively, that Carr knew Richardson did not assault him but decided to arrest him anyway—then Carr had no probable cause to arrest Richardson for assault. Furthermore, if the jury draws either of these inferences, qualified immunity would not shield Carr with arguable probable cause, because his probable-cause determination was either unreasonable or fabricated. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("[Qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." (internal citation omitted)).

Carr argues that in the video, a male voice says, "I'll beat your ass," though its provenance was unclear. (Dkt. 47 at 9; Video 3 at 4:33:38). According to Carr, even if he mistakenly believed Richardson made this statement, he would be entitled to qualified immunity. (Dkt. 47 at 10). True,

11

qualified immunity "gives government officials to make reasonable but mistaken judgments about open legal questions." *Al-Kidd*, 563 U.S. at 743. But Carr's subjective belief Richardson made that statement goes to the underlying factual dispute about the alleged assault, rather than an open legal question about probable cause. The jury has to weigh Carr's credibility when he testifies he believed Richardson made that statement against the credibility of Richardson's testimony that he never made that statement. The jury is not compelled to take Carr at his word on this disputed matter. Moreover, even if the jury does believe Carr thought Richardson said it, words alone are not an assault. *Floyd*, 66 N.E.2d at 76. The jury must also evaluate Richardson's gesture in combination with his alleged statements to decide if, under all the circumstances, it was objectively reasonable for Carr to apprehend an imminent battery.

The parties also dispute the facts underlying Carr's probable cause to arrest Richardson for resisting arrest and battery. Illinois law provides, "A person who knowingly resists or obstructs the performance of one known to the person to be a peace officer . . . of any authorized act within his or her official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a). But reading the facts in the light most favorable to Richardson, he did not know a police officer was arresting him when he struggled with Carr. (Dkt. 51 ¶ 21; Dkt. 57 ¶ 13). His back was turned when Carr started moving in to arrest him, (*see* Video 3 at 4:35:44–48), and according to Richardson, Carr made physical contact with him before saying he was under arrest. (Dkt. 57 ¶ 13). It happened so fast that Richardson thought he was being attacked and tried to escape. (Dkt. 47-2 at 34:9–35:3). If a jury believes Richardson's account, then struggling against a presumed attacker was a reasonable, justified response. Carr had no probable cause to arrest Richardson for resisting arrest if Richardson did not know he was being arrested.

Neither would arguable probable cause apply in that case. If the situation unfolded as Richardson contends, then no reasonable officer in Carr's place could have assumed Richardson was aware he was being lawfully arrested. A reasonable officer understands that grabbing someone from behind, when he is neither provoking the officer nor making any threat to anyone in the vicinity, would cause a person immediate fear for his own safety. This is especially true if the officer gives no warning. Qualified immunity does not shield an officer from objectively unreasonable actions or judgments.

Finally, the parties dispute the underlying facts regarding Carr's probable-cause determination to arrest Richardson for battery. A person commits a battery when he intentionally or knowingly, and without legal justification, makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12-3(a). But a person may use reasonable force to defend himself when he is faced with unlawful force, is not the aggressor, and believes he is in imminent danger. *See People v. Shields*, 700 N.E.2d 168, 172 (Ill. App. Ct. 1998). Here, Richardson made the alleged "battery" against Carr while struggling with someone he claims he thought was attacking him from behind and without provocation. (Dkt. 47-2 at 34:9–35:3). Further, Richardson claims he used only enough force to try to get away, and he did not fight with the officers. (*Id.* at 34:19–24 ("At this point, I'm trying to get away. I didn't throw no punches. I didn't, like, attack him. You see me trying to escape because he didn't even let me know it was him or it was a cop or that I was under arrest. I didn't know what was going on. He just attacked me.")). If a jury believes Richardson, it could also reasonably find Carr had no probable cause to arrest him for battery when Richardson was justified in defending himself against an attack. Likewise, Carr had no arguable probable cause if a reasonable officer in his place would have seen Richardson's actions as justified self-defense.

13

On this record, the Court cannot conclude as a matter of law that either Carr (1) had probable cause to arrest Richardson for assault, or (2) that any mistaken belief he may have had about probable cause to arrest Richardson for assault was objectively reasonable. Further, based on the disputed material facts about how the arrest occurred with officers potentially coming up from behind while Richardson was facing the counter, a jury will need to make fact determinations about the arrest. Thus, Richardson's false-arrest claim against Carr survives summary judgment.

### b. Officer Herrera

Officer Herrera, on the other hand, had probable cause to arrest Richardson for resisting arrest and battery. Herrera responded to Carr's request for assistance and knew nearly nothing of what had happened in the White Castle before backing up Carr in arresting Richardson. (*See* Dkt. 47-3 at 42:4–20). He only heard Carr's radio request for assistance stating, "unruly subjects in the White Castle." (Dkt. 47-3 at 69:19, 91:4–9). He thus never made any independent probable-cause determination to arrest Richardson for assaulting Carr—he came to assist Carr as requested and had no time to assess the situation. Herrera never argued he had probable cause to arrest Richardson for assault; nor did he need to. The surveillance footage clearly shows Herrera did not participate in Carr's seizure of Richardson until Herrera saw: 1) Carr move in to arrest Richardson, 2) Carr grab Richardson's wrist and handcuff him, and 3) Richardson pull away. (Dkt. 51 ¶¶ 26–27; Video 3 at 4:35:46–50).

At that point, Herrera had probable cause to arrest Richardson for resisting arrest. A reasonable officer in Herrera's place, observing a subject pulling away from a police officer in full uniform who has handcuffed him, has probable cause to arrest that subject for resisting arrest. This is true even if the underlying arrest later proves to be unlawful. *People v. Villarreal*, 604 N.E.2d, 923, 925–26 (Ill. 1992). Likewise, an officer in Herrera's place would have observed Richardson

push himself against Carr in the struggle. At that point, Herrera had probable cause to arrest Richardson for battery. When Herrera participated in the seizure of Richardson, therefore, Herrera had probable cause to arrest him for resisting arrest and for battery.

### c. Officer Biddings

Finally, Officer Biddings also had probable cause to arrest Richardson for resisting arrest. Biddings arrived on the scene during the struggle between Herrera, Carr, and Richardson, after the alleged assault and the alleged battery. (Dkt. 51 ¶ 32; Video 3 at 4:36:35–48). On entering the White Castle, Biddings observed Herrera and Carr struggling to arrest Richardson. (Dkt. 51 ¶ 32–33). With essentially no other context, Biddings participated in the arrest by pulling Richardson's legs out from under him, holding him down on the restaurant floor, and handcuffing him. (Dkt. 51 ¶ 36). Again, even if the underlying arrest were unlawful, and even if Richardson still somehow did not know at that point he was being arrested by police, this does not matter to the objective probable-cause determination. Biddings's observations in the few moments after he entered the White Castle—Carr and Herrera in full uniform, holding a struggling suspect—gave him probable cause to believe that Richardson was resisting Carr's and Herrera's arrest.

\*     \*     \*

In short, the Court denies Officer Carr summary judgment on Richardson's false-arrest claim. The jury must resolve underlying factual disputes before determining whether Carr had either probable cause or arguable probable cause to arrest Richardson. The Court grants Officer Herrera and Officer Biddings summary judgment on Richardson's false-arrest claim because they had probable cause to arrest Richardson when they participated in his seizure.

15

2. **Excessive Use of Force**

The Fourth Amendment prohibits officers from using excessive force to seize a person to arrest them. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012)). The court evaluates the reasonableness of the officer's actions considering "the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. The Fourth Amendment's reasonableness test cannot be precisely defined or mechanically applied. *Id.* at 396. Rather, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Whether a particular use of force was reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* This is an objective inquiry; the officer's underlying intent or motivation is irrelevant. *Id.* at 397. Because the reasonableness inquiry is so fact-intensive, "the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Gupta*, 19 F.4th at 996 (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)).

Here, Richardson's alleged predicate crime for arrest was minor and non-violent. He posed no threat when Carr initiated the arrest. These factors viewed alone weigh against the objective reasonableness of the officers using force to arrest Richardson. *See Gupta*, 19 F.4th at 1001 (noting that officers "do not have the right to shove, push, or otherwise assault innocent citizens without

any provocation whatsoever" (internal citations omitted)). Richardson does not dispute that he actively evaded or resisted the arrest throughout. (Dkt. 51 ¶¶ 21–22, 25, 28, 32–33, 38–41).[1] Nor could he dispute this in good faith, as the video makes clear. He admits he only stopped struggling after he was already on the ground, handcuffed, and Lloyd had also been arrested. (Dkt. 47-2 at 41:19–42:1).

A jury will need to determine if Carr, Herrera, and Biddings used the appropriate level of force to arrest Richardson based on the numerous factual discrepancies. The officers largely dispute Richardson's account: that Carr first grabbed Richardson's wrist, "immediately yanked it back," and then put his arm in a lock without any warning or provocation. (Dkt. 47-2 at 34:13–18; Dkt. 57 ¶ 13). They dispute whether Carr and Herrera then pushed him into the corner between the wall and the counter, slamming his head against the wall at least twice, while Herrera yelled obscenities at Richardson like, "we got you, motherf-----." (Dkt. 57 ¶¶ 15–16). They dispute slamming Richardson's head into the plexiglass while Richardson yelled out his mother's phone number and begged bystanders to get help. (*Id.* ¶¶ 17–18). They dispute Herrera putting him in a headlock and choking him, while Carr held him from behind and Biddings pulled his legs out from under him. (Dkt. 47-2 at 101:6; Dkt. 57 ¶ 21). They dispute whether Biddings and Carr kneeled on top of Richardson, with his arm in a lock and with all their weight on him while pulling up on his arm. (Dkt. 47-2 at 40:8–21; Dkt. 57 ¶ 44). Richardson claims Biddings jabbed at his legs with his taser hard enough for him to think Biddings was kicking him. (Dkt. 47-2 at 40:22–41:16). Finally, the parties dispute whether the car was stopped on the way to the police station as Richardson alleges. (Dkt. 57 ¶¶ 24–25, 27). Richardson also testified Herrera transported him from White

---

[1] In many of his responses to Defendants' statements of material fact, Richardson does not dispute that he "attempted to flee the excessive force" the officers were using. The Court treats this as a factual admission, as Richardson inappropriately makes a legal conclusion about the underlying facts Defendants state rather than denying the assertions and responding with citations to the record for contradictory evidence.

Castle to the police station, and that Herrera stopped the car and struck him. (Dkt. 47-2 at 44:12–47:19; Dkt. 57 ¶ 24–25).

A jury must sort out the disputed versions of what occurred at the White Castle that afternoon and in the car on the way to the police station. Until then, the Court cannot determine whether officers used more force than was reasonably necessary during the arrest or if they are entitled to qualified immunity for any reasonable mistakes about their use of force. *See Gupta*, 19 F.4th at 996 (holding disputed facts over the degree of force used precluded summary judgment). The Court denies Officers Carr, Herrera, and Biddings summary judgment on Richardson's excessive-force claims.

### 3. Unlawful Pretrial Detention

Police violate the Fourth Amendment when they "hold someone without any reason before the formal onset of a criminal proceeding" without probable cause that the person committed a crime. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918 (2017); *Lewis v. City of Chicago*, 914 F.3d 472, 476–77 (7th Cir. 2019). After his arrest, Richardson spent the night in the Dolton jail before his arraignment the next morning and release on bail. (Dkt. 47-2 at 47:20–48:15; *id.* at 53:3–21). Richardson alleged that the defendant officers falsified their police report to justify his detention when they had no probable cause to arrest him for or charge him with misdemeanor assault, resisting a peace officer, and battery. (Dkt. 21 ¶¶ 14, 26–33; Dkt. 51 ¶¶ 45–46).

Defendants' summary judgment brief fails to address Richardson's Section 1983 unlawful pretrial detention claims against all three officers. (*See generally* Dkt. 47). Richardson maintains Defendants therefore waived summary judgment on those claims. (Dkt. 54 at 10). Defendants failed in their opening brief at summary judgment to respond *at all* to Richardson's unlawful detention claim, Count III of his complaint. Defendants' reply brief cursorily notes the officers'

probable cause for all charges as a defense to the unlawful pretrial detention claims. (Dkt. 58 at 9–10). Nevertheless, the argument is waived. *See Carroll v. Lynch*, 698 F.3d 561, 564 n.2 (7th Cir. 2015) (argument first raised in reply brief waived); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (same); *Dye v. United States*, 360 F.3d 744, 751 n.7 (7th Cir. 2004) (same).

Richardson's unlawful pretrial detention claims against Defendants (Count III) therefore survive summary judgment because Defendants waived any arguments or defenses to these claims by failing to address them.

### 4. Conspiracy

Richardson next argues that the defendant officers conspired to "punish [him] for a crime he did not commit," thereby depriving him of his constitutional rights. (Dkt. 21 ¶ 35). "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). Defendants argue he cannot prove the elements of his claim on the evidence in the record. The Court agrees.

Like the plaintiff in the court's recent decision in *Holloway*, Richardson has provided insufficient evidence to allow a reasonable jury's inference that Defendants reached an agreement to deprive him of his constitutional rights. *See id.* Although Richardson's false-arrest claim survives against Carr for his probable-cause determination to arrest him for assault, Carr alone made that determination, wrote the police report with alleged false statements, signed the criminal charges against Richardson, and failed to follow up on those charges by not showing up to court. (Dkt. 51 ¶ 47). Thus, no other officer "reached an agreement" to deprive him of his rights.

Richardson argues circumstantial evidence shows Defendants acted in concert to prevent their misdeeds from coming to light. "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman*, 776 F.3d at 511 (citing *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)). The strongest evidence of this conspiracy, Richardson contends, is his testimony that Herrera allegedly stopped his car on the way to the station and beat Richardson. (Dkt. 54 at 18; Dkt. 57 ¶¶ 24–25). He points to evidence of a police radio call where Biddings says, "Hey, uh, Enrique, stop right there," with no other context. (Dkt. 56, Audio 2; Dkt. 47-4 at 35:11–26:4). This communication between two officers, he argues, would allow a jury to reasonably infer an "agreement to deprive" him of his rights if the jury also believes his testimony about Herrera's beating. But this is too speculative to survive summary judgment. A single, seconds-long radio communication, with no additional context for when or where it occurred, cannot support the reasonable inference that they agreed to cover up a civil-rights violation.

Richardson cannot muster sufficient evidence to show Defendants reached an agreement to deprive him of his constitutional rights; therefore, the Court grants Defendants summary judgment on Count IV of Richardson's Complaint.

### B. State-Law Claims

In addition to Richardson's constitutional claims, he brings state-law claims for battery, intentional infliction of emotional distress, and malicious prosecution against Defendants Carr, Herrera, and Biddings, and against the Village of Dolton on a respondeat superior theory as the officers' employer. He also brings an indemnification claim under 745 ILCS 10/9-102 against the Village of Dolton as the officers' employer.

As a general defense to all state-law claims, Defendants raise their immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("the Act"). The Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. "[W]illful and wanton conduct" means conduct that either "shows an actual or deliberate intention to cause harm" or "shows an utter indifference to or conscious disregard for the safety of others . . . ." 745 ILCS 10/1-210. This standard is more difficult for a plaintiff to overcome than the Fourth Amendment's objective reasonableness standard. *See DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1013 (7th Cir. 2006).

### 1. Battery

Defendants make no argument on the merits of Richardson's battery claims against the defendant officers or the Village of Dolton's liability for battery on a respondeat superior theory. Defendants only argue that all federal claims invariably fail, so this Court should not exercise its discretionary supplemental jurisdiction over the state-law claims after granting summary judgment on the federal claims. (Dkt. 47 at 7–8). But some federal claims survive summary judgment. Defendants lost their gamble in not arguing an alternative basis for summary judgment on the battery claims, other than the Act's immunity for official conduct when it is not willful or wanton.

Under the Act, probable cause to arrest defeats the claim an officer's conduct was willful or wanton in effectuating that arrest. *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 320 (Ill. App. Ct. 2006). Officers Herrera and Biddings had probable cause to arrest Richardson for resisting arrest and battery. They are therefore immune from Richardson's battery claim under the Act for intentional physical contact that occurred during the arrest. Their conduct in arresting him was reasonable under the Fourth Amendment, so it cannot be willful or wanton under state law.

21

Richardson's false-arrest claim against Officer Carr, however, survives summary judgment. Under Illinois law, a person commits the intentional tort of battery when "he acts intending to cause a harmful or offensive contact with" another person and "a harmful or offensive contact with the person . . . directly or indirectly results" without the person's consent. *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill. App. Ct. 1995) (quoting the Restatement (Second) of Torts, § 13 (1965)). An "offensive contact" is one that "offends a reasonable sense of personal dignity." *Id.* (quoting the Restatement (Second) of Torts, § 19 (1965)). Generally, "[a]ny intentional offensive physical touching is a battery unless privileged. That is the character of a false arrest in which the arrested person is physically seized." *Herzog v. Village of Winnetka, Ill.*, 309 F.3d 1041, 1044 (7th Cir. 2002).

A jury must determine if Carr committed a battery against Richardson when Carr first grabbed his wrist to arrest him. As discussed, genuine issues of material fact exist as to whether Carr had probable cause to arrest Richardson for assault. If Carr lacked probable cause to arrest Richardson for assault, then the physical contact he made with Richardson to seize him had no legal justification. Richardson has also provided sufficient evidence for a jury to reasonably find this physical contact was objectively harmful or offensive. Richardson testified Carr grabbed him from behind with no warning, and he thought he was being attacked. Certainly, if any average citizen had done the same, the contact would have been objectively offensive. The tort of battery recognizes that even the slightest intentional, unprivileged physical contact can be harmful or offensive. *See Herzog*, 309 F.3d at 1044.

Moreover, reading the facts in the light most favorable to Richardson, a jury could infer Carr's conduct was willful and wanton. As discussed, a jury may reasonably conclude after weighing the credibility of the witnesses' testimony and the video surveillance footage that no

assault occurred. It may then further conclude Carr knew Richardson did not assault him but wanted to arrest him anyway for no good reason. For example, it could be inferred that Carr just disliked Richardson and thought he was a troublemaker who should be arrested and punished. The jury might infer as much from the way Carr testified about his observations of Richardson and Lloyd in the White Castle, coupled with the way Carr arrested him—grabbing Richardson from behind with no verbal warning and no opportunity to comply, as Richardson tells it. While the standard for willful and wanton conduct is high, the Court does not foreclose a jury from so finding, at least not before weighing disputed facts and determining if Carr had probable cause to arrest Richardson for assault.

Furthermore, Richardson alleges that Herrera stopped his patrol car on the way to the station and struck him several times when he was already subdued and handcuffed. (Dkt. 57 ¶¶ 24–25; Dkt. 47-2 at 44:12–47:19). Richardson's testimony is essentially unrebutted in the record. If true, such a course of conduct would certainly qualify as a battery that meets the willful and wanton threshold, overcoming Herrera's immunity defense to battery under the Act. The jury must determine what happened here.

The Court thus denies Carr and Herrera summary judgment on Richardson's claim against Carr for battery. The Village of Dolton advanced no argument about Richardson's respondeat superior theory of liability for its employees' tortious conduct; it then forfeits any argument or defense at summary judgment. The Court denies the Village of Dolton summary judgment for any potential liability for Richardson's battery claims.

## 2. Intentional Infliction of Emotional Distress

Illinois follows the Restatement (Second) of Torts, § 46 (1965), for claims of intentional infliction of emotional distress ("IIED"). *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To

recover, the plaintiff must prove (1) defendant's conduct was "truly extreme and outrageous;" (2) the defendant intended either "that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress;" and (3) that the conduct in fact caused *severe* emotional distress. *Id.* (citing *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976) (emphasis in original)). The plaintiff's emotional distress "must be so severe that no reasonable person could be expected to endure it." *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. 1997).

The Court agrees with Defendants that on this record, Richardson has failed to come forward with sufficient evidence that a reasonable jury could find he suffered "severe" emotional distress under Illinois law.[2] Defendants are thus entitled to summary judgment on this claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Under Illinois law, the indignity, humiliation, and anxiety a person suffers after an arrest and criminal charges is not "severe" emotional distress. *See Fricano v. Chicago White Sox, Ltd.*, 2012 IL App (1st) 101978-U, ¶ 70 (no severe emotional distress when plaintiff had anxiety and trouble sleeping and eating as a result of arrest and criminal proceedings); *Adams*, 684 N.E.2d at 942 (no severe emotional distress when plaintiff suffered shame, humiliation, and worry as a result of criminal trespass charges); *Khan v. American Airlines*, 639 N.E.2d 210, 215 (Ill. 1994) (no severe emotional distress when plaintiff had problems sleeping, fears of being arrested again, and recurring nightmares of being arrested).

The Court grants Defendants summary judgment on Richardson's IIED claims.

### 3. Malicious Prosecution

---

[2] Defendants' sole argument on this claim is that "the record does not support Plaintiff's claims of outrageous or extreme conduct. Even if accepting Plaintiff's version of events as true, the distress was not so severe that no reasonable man could be expected to endure it. There is no indication that Plaintiff suffered severe emotional distress as required under Illinois law." (Dkt. 47 at 14). Richardson's brief is equally short on case law or citation to the record. The Court notes Richardson testified about the emotional consequences of his arrest and attending a session with a therapist. (Dkt. 47-2 at 65:2–66:4).

To recover on a claim for malicious prosecution, a plaintiff must show: "(1) The commencement of or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). The dismissal of criminal charges *nolle prosequi* is considered a termination in favor of the accused when it is consistent with an inference of the accused's innocence. *Id.* at 1242–43. A *nolle prosequi* dismissal would not be consistent with innocence when it is "the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." *Id.* at 1243.

Based on the disputed material facts regarding the arrest, the malicious prosecution claim against Officer Carr and the Village of Dolton on respondeat superior must go forward at this stage. Carr signed three criminal complaints against Richardson for assault, battery, and resisting a peace officer, but he never showed up to any court dates or followed up to take any witness statements or retrieve the surveillance footage. The criminal proceedings continued for a year-and-a-half, and they were dismissed *nolle prosequi* after Richardson's criminal defense attorney acquired the surveillance video and showed it to the state's attorney. This supports a reasonable inference in Richardson's favor that the proceedings ended in a manner consistent with his innonence. Probable cause to arrest is disputed, and "[a] lack of probable cause is sufficient to permit an inference of malice by the trier of fact." *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 274 (Ill. App. Ct. 2002). Richardson suffered damages when he lost out on job opportunities because of the pending charges against him. Richardson has alleged sufficient facts supporting

each element that, if true, could support a reasonable jury finding in his favor. If the trial record conflicts with the elements, the Defense may raise the appropriate motion at the appropriate time. The Village of Dolton did not argue against Richardson's respondeat superior theory of liability on the malicious prosecution claim.

The Court denies Defendants summary judgment to Officer Carr and the Village of Dolton on Richardson's malicious prosecution claims.

### 4. Indemnification

Richardson alleges that the Village of Dolton, as the Defendant officers' employer, would be liable under Illinois's indemnity statute for any tort judgment or settlement for compensatory damages for which they are found liable while acting in the scope of their employment. 745 ILCS 10/9-102. Defendants concede as much. They only argue the claim must be dismissed because Richardson's substantive claims fail at summary judgment. (Dkt. 47 at 14). But some claims survive, so the Village of Dolton may yet be liable for any judgment against Defendant Officers. The Court then denies the Village of Dolton summary judgment on Richardson's indemnification claim.

CONCLUSION

In conclusion, on the Court denies Defendants' Motion for Summary Judgment [46] as to Defendant Officers Carr, Herrera, and Biddings on Count I (excessive force) and Count III (unlawful pretrial detention). On Count II (false arrest), the Court denies Officer Carr summary judgment but grants Officers Herrera and Biddings summary judgment. The Court grants all Defendant Officers summary judgment on Count IV (Section 1983 conspiracy).

Further, the Court denies the Village of Dolton's Motion for Summary Judgment on Count V (indemnification). On Count VI (battery), the Court grants Officer Biddings summary judgment

and denies Officers Carr and Herrera and the Village of Dolton summary judgment. The Court grants all Defendants summary judgment on Count VII (IIED) and denies Officer Carr and the Village of Dolton summary judgment on Count VIII (malicious prosecution).

Virginia M. Kendall
United States District Judge

Date: September 30, 2022